*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0360P (6th Cir.)
File Name: 01a0360p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION,
　　　　*Plaintiff-Appellant,*

　　　*v.*

HECTOR V. BARRETO, in his
official capacity as
Administrator of the Small
Business Administration,*
　　　　*Defendant-Appellee.*

No. 98-6020

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 92-01019—Todd J. Campbell, District Judge.

Argued: August 9, 1999

Decided and Filed: October 9, 2001

——————————————

*Pursuant to Fed. R. App. P. 43(c)(2), Hector V. Barreto is automatically substituted for Aida Alvarez, former Administrator of the Small Business Administration, as a defendant in this action.

1

Before:  NORRIS and SUHRHEINRICH, Circuit Judges;
RICE, Chief District Judge.[**]

———————————

**COUNSEL**

**ARGUED:**    John  S.  Hicks,  BAKER,  DONELSON,
BEARMAN  &  CALDWELL,  Nashville,  Tennessee,  for
Appellant.   Robert  C.  Watson,  ASSISTANT  UNITED
STATES ATTORNEY, Nashville, Tennessee, for Appellee.
**ON  BRIEF:**    John  S.  Hicks,  BAKER,  DONELSON,
BEARMAN  &  CALDWELL,  Nashville,  Tennessee,  for
Appellant.    Robert  C.  Watson,  ASSISTANT  UNITED
STATES ATTORNEY, Nashville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

   WALTER  HERBERT  RICE,  Chief  District  Judge.   This
litigation  stems  from  a  loan  guaranty  agreement  between
appellant First Tennessee Bank National Association ("First
Tennessee") and the Small Business Administration ("SBA").
After  the  SBA  failed  to  honor  the  agreement,  First  Tennessee
filed an official-capacity suit against the Administrator of the
SBA. First Tennessee's lawsuit sought to compel the SBA to
honor  the  guaranty  agreement  by  repurchasing  a  defaulted
loan. Following a bench trial, the district court entered final
judgment in favor of the SBA on June 15, 1998.  The district
court  concluded,  *inter  alia*,  (1)  that  SBA  regulations  placed
the  burden  upon  First  Tennessee  to  establish  its  substantial
compliance with the terms of the guaranty agreement, and (2)
that First Tennessee had materially breached the agreement.
First  Tennessee  has  filed  a  timely  appeal  from  the  district
court's ruling, advancing two arguments.  First, it asserts that

---

[**] The Honorable Walter Herbert Rice, Chief United States District
Judge for the Southern District of Ohio, sitting by designation.

### III. *Conclusion*

Based upon the reasoning set forth above, the judgment of the United States District Court for the Middle District of Tennessee, Nashville Division, is hereby AFFIRMED.

the district court misallocated the burden of proof by requiring it to demonstrate substantial compliance with the terms of the guaranty agreement. Second, the bank contends that the district court erred in ruling that it had materially breached the agreement. For the reasons set forth below, we find both arguments unpersuasive, and we affirm the judgment of the district court.

### I. *Factual and Procedural Background*

First Tennessee and the SBA entered into an agreement on September 21, 1978, under which the SBA promised to guaranty certain loans that the bank made to small businesses. The agreement covered "only loans duly approved hereafter for guaranty by [the bank] and SBA subject to SBA's Rules and Regulations as promulgated from time to time." Among other things, the agreement obligated First Tennessee to "close and disburse each loan in accordance with the terms and conditions of the approved loan authorization[.]" It also required the bank to execute documents and to "take such other actions which shall, consistent with prudent closing practices, be required in order fully to protect or preserve the interest of Lender [First Tennessee] and SBA in the loan."

On June 20, 1990, First Tennessee filed an application with the SBA, asking the agency to guaranty a revolving line of credit loan that the bank wished to extend to Telware International, Inc. ("Telware"), an export company. Deryl Bauman, Vice President and Commercial Loan Officer/Relationship Manager for First Tennessee, served as the loan officer who assisted Telware in obtaining the SBA guaranty. Specifically, Bauman helped Telware prepare a loan guaranty application, and he negotiated with Ron Reed, the Chief Credit Administrator at the SBA's Nashville office. The SBA subsequently approved First Tennessee's request and issued a loan authorization, agreeing to guaranty eighty-five percent of the bank's revolving line of credit to Telware, up to $882,350. An initial draft of the loan authorization provided that any "letter of credit" issued on behalf of a purchaser of Telware's goods would be confirmed by a

United States bank or a bank acceptable to the lender, and that the goods at issue would be insured with FCIA insurance.[1] The final version of the loan authorization permitted a letter of credit either to be confirmed or to be FCIA insured. The loan authorization also was made subject to the terms of the First Tennessee–SBA guaranty agreement mentioned above.

Telware subsequently obtained the revolving line of credit loan from First Tennessee and successfully consummated several export transactions. On two occasions in particular, Telware used the line of credit to finance its sale of beans to Centrocoop, a Yugoslavian food distributor. In each instance, Telware obtained letters of credit issued by Beogradska Banka in Yugoslavia, and it prepared the various documents which were used to obtain payment from the Banka. On each occasion, First Tennessee also received notice that Beogradska Banka had acknowledged Telware's assignment of its interest in the letters of credit to First Tennessee. Such an acknowledgment was required by the loan guaranty application which had been submitted by First Tennessee on behalf of Telware.

The transaction giving rise to the present litigation occurred on December 12, 1990, when Telware agreed to sell 1,000 metric tons of navy beans and 1,000 metric tons of pinto beans to Centrocoop. Thereafter, on January 29, 1991,

---

[1] A commercial letter of credit "is used in a sale of goods transaction as a payment device[.]" *In re Graham Square, Inc.*, 126 F.3d 823, 827 (6th Cir. 1997). In the context of the present dispute, such letters were used by Telware and First Tennessee to avoid disputes over the quality of the goods transported by Telware to purchasers who were located in different countries. Such letters generally are issued by a foreign buyer's bank, which obligates itself to pay the funds represented by the letter of credit upon the presentation of certain documents by the holder of the letter. In typical sales transactions, those documents include bills of lading from the shipper, or certificates of quality that may be required by the terms of a letter of credit. (JA 209-210). "Confirmation" of a letter of credit is a process through which a bank (other than the bank which issued the letter) agrees to pay the amount stated in the letter upon the presentation of proper documentation. "FCIA insurance" refers to a federal program that provides insurance coverage for export transactions.

---

*Heritage Bank & Trust Co.*, 906 F.2d at 301-02 (reasoning that a bank's non-compliance with SBA regulations constitutes a material breach of a loan guaranty agreement); *Pittsburgh Nat'l Bank*, 898 F.2d at 338 (recognizing that a lender's failure to service an SBA-backed loan in a commercially prudent manner may constitute a material breach of a guaranty agreement); *Citizens Marine Nat'l Bank v. United States Dept. of Commerce*, 854 F.2d 223, 228 (7th Cir. 1988) (reasoning that the failure to use care and diligence in the administration of an Economic Development Administration loan constitutes a material breach of the bank's guaranty agreement with the agency), *cert. denied*, 489 U.S. 1053 (1999).

---

Tennessee argues that any disproportionate prejudice to the SBA was caused by Beogradska Banka. As the district court recognized, however, the parties' "bargained-for objectives" were set forth in the guaranty agreement and pertinent regulations. By failing to comply with the requirements set forth therein, First Tennessee did indeed defeat the SBA's bargained-for objectives by increasing the risk of loss to the agency. Similarly, First Tennessee's imprudent loan servicing may have caused disproportionate prejudice to the SBA, given the fact that the bank took no action to protect the interests of the SBA, despite its ability to do so. With respect to the third factor, custom and usage, we find no error in the district court's conclusion that "prudent bankers, at a minimum, follow up in some way when letters of credit are dishonored for a discrepancy in the documents." Such a conclusion is supported by the trial testimony. Finally, First Tennessee argues that releasing the SBA from its guaranty agreement would bestow an "unfair advantage" upon the agency. We cannot agree. Releasing the SBA from its guaranty obligation undoubtedly will work to the agency's "advantage." Such an advantage, however, is neither unfair nor unreasonable, given First Tennessee's violation of its contractual obligation to service its Telware loan prudently, and the possibility that the bank's inaction may have resulted in the loan default. *Cf. First Interstate Bank of Idaho v. Small Bus. Admin.*, 868 F.2d 340, 345 (9th Cir. 1989) ("In this case affirmance undoubtedly releases the SBA from a contractual liability. But the advantage is not unreasonable, given the bank's clear violation of the contracted-for disbursement amounts and purposes, and the bank's fraudulent conduct in filing false statements."); *Pittsburgh Nat'l Bank*, 898 F.2d at 338 ("Finally no unfair advantage will accrue to SBA as a result of releasing it from its contractual liability . . . since it was [the bank's] own delay which caused the loss of the proceeds from the check.").

First Tennessee expert witness James E. Byrne agreed that "from time to time" one bank can dispute a perceived discrepancy and obtain payment on a letter of credit. Finally, SBA expert Peter Iorlano recalled times when a paying bank initially had claimed a document discrepancy, but then had honored a letter of credit, after a "strenuous objection" by the document-presenting bank. Additionally, Iorlano explained a bank such as First Tennessee could have spoken with higher-level individuals at the foreign bank in order to obtain document approval. He also mentioned other options at First Tennessee's disposal, including: (1) having a vice-president of the document-presenting bank communicate personally with contacts at the foreign bank, or elsewhere in the foreign country; (2) pressuring representatives of Beogradska Banka who were located in the United States: or (3) presenting the dispute to an international banking organization for its review and assistance.

In light of the foregoing testimony, we find no clear error in the district court's conclusion that First Tennessee breached its loan guaranty agreement by failing to intervene after Beogradska Banka's rejection of Telware's documentation and letter of credit. We also agree that the bank's breach was "material," because various actions by First Tennessee *may have* persuaded Beogradska Banka to honor the letter of credit, and because the bank's failure to initiate such actions violated key terms of the guaranty agreement and the rules and regulations incorporated therein by reference.[18]    *Cf.*

---

[18]When assessing materiality in the context of SBA loan guarantees, federal courts generally have considered four factors: (1) whether the breach defeated a bargained-for objective; (2) whether the breach caused disproportionate prejudice to the non-breaching party; (3) whether custom or usage favors a finding of materiality; and (4) whether allowance of reciprocal non-performance would result in an unreasonable and unfair advantage to either party. *See, e.g., Heritage Bank & Trust Co.*, 906 F.2d at 301; *Sanders*, 826 F.2d at 617. With respect to the first factor, First Tennessee contends that Beogradska Banka's "wrongful dishonor," and not its failure to act as a prudent lending institution, defeated the SBA's bargained-for objective of "a successful loan to a small business and repayment of the same." Likewise, with respect to the second factor, First

---

Beogradska Banka provided Telware with a letter of credit in the amount of $1,235,000 to secure Centrocoop's payment for the beans. Pursuant to the loan authorization, First Tennessee advanced funds to Telware, which enabled the company to purchase the beans for resale to Centrocoop. First Tennessee also received confirmation that Beogradska Banka in New York would "discount" the letter of credit.[2]  Telware then assigned to First Tennessee its interest in the proceeds from the letter of credit. First Tennessee, however, neither received nor requested confirmation from Beogradska Banka that the Yugoslavian bank had approved the assignment of Telware's interest in the letter of credit to First Tennessee. Additionally, because the timing of its bean shipment to Centrocoop was critical, Telware lacked the time necessary to obtain FCIA insurance. Telware also was unable to have the letter of credit issued by Beogradska Banka confirmed in time to meet Centrocoop's shipping demands. As noted above, however, the loan authorization issued by the SBA *required* either FCIA insurance or confirmation of the letter of credit. Given its inability to meet either requirement, Telware asked the SBA for a waiver. On February 1, 1991, First Tennessee representative Bauman met with SBA representative Reed, who approved Telware's request for a waiver of the agency's requirement for FCIA insurance or a confirmed letter of credit. After receiving the waiver, Telware commenced the shipment of its beans to Yugoslavia.

With respect to financing the bean transaction, the parties anticipated that Telware would present proper documentation to Beogradska Banka, which then would honor the letter of credit that it had issued on behalf of Centrocoop. Such a payment by Beogradska Banka was necessary in order for Telware to repay the First Tennessee loan, which had enabled

---

[2]"Discounting" means "making adequate allowance for the earning power of money." *Shaw v. United States*, 741 F.2d 1202, 1204 n.1 (9th Cir. 1984). In the context of the present case, it involves a bank's payment of less than the face value of a letter of credit, prior to the date that the letter of credit becomes payable, upon the presentation of certain documentation required by the letter of credit.

it to purchase the beans for resale to Centrocoop. As a result, Telware assembled the documentation required under the letter of credit and presented that documentation to Beogradska Banka. The Yugoslavian bank refused to accept Telware's documentation, however, claiming that certain bills of lading were endorsed incorrectly.[3] Following Beogradska Banka's rejection of the documentation, Telware contacted Bauman at First Tennessee and informed him of the problem. Although Bauman was concerned (because no rejection had occurred in the two prior Telware-Centrocoop transactions) he took no action and instead departed on a scheduled vacation. Upon his return, Bauman learned that Telware had submitted additional documents to Beogradska Banka, which once again had rejected them. At that time, Bauman and Telware discovered that Centrocoop had alleged problems with the quality of Telware's prior bean shipments. Telware assured Bauman that it would resolve the situation.

Telware's first action was to divert the bean shipment to Malta. It then obtained an extension of the maturity date on its loan from First Tennessee. Despite the extension, Telware subsequently defaulted on the loan, and its beans were sold for significantly less than what Centrocoop would have paid for them. After First Tennessee applied the proceeds from the bean sale to Telware's debt, the outstanding principal balance on the defaulted loan was $615,442.75. On June 9, 1992, First Tennessee asked the SBA to repurchase eighty-five percent of this outstanding balance, plus interest, in accordance with the terms of the loan guaranty agreement. The SBA refused to honor the guaranty agreement, however, contending that First Tennessee had materially breached its terms by not servicing the Telware loan prudently, as required by SBA regulations and by the guaranty agreement itself. First Tennessee subsequently commenced the present litigation to enforce the loan guaranty against the SBA. The matter proceeded to a bench trial in March, 1998.

---

[3]At trial, the parties stipulated that the documents presented by Telware complied with the terms of the letter of credit and should have been accepted by Beogradska Banka.

(2) failing to intervene after Beogradska Banka's dishonor of the letter of credit. Once again, we find no error in the district court's conclusion. First Tennessee insists that its failure to review the documents could not have constituted a material breach of the guaranty agreement, given the parties' stipulation that those documents were accurate and should have been honored by the Yugoslavian bank. Although this argument possesses some appeal, the bulk of the district court's analysis focused upon the second material breach, namely First Tennessee's inaction *after* Beogradska Banka had dishonored Telware's documents and the letter of credit. Specifically, the district court reasoned that "First Tennessee could and should have taken further actions, following the initial dishonor of the letter of credit to protect its interests and the interests of the SBA, but it did not." The court concluded that such actions "may" have persuaded Beogradska Banka to honor the letter of credit.

The district court's finding that First Tennessee's post-dishonor inaction constituted a material breach of the guaranty agreement must be affirmed unless such a finding is clearly erroneous. *Valley Nat'l Bank*, 918 F.2d at 130. In light of the testimony presented at trial, we find no clear error in the district court's ruling. As noted above, Bauman testified that his only action, upon discovering Beogradska Banka's rejection of the documents and the letter of credit, was to speak with Fatima Telware, who assured him that she personally would handle the problem. Even after Beogradska Banka dishonored the letter of credit a second time, Bauman took no action whatsoever. Notably, Bauman did not approach First Tennessee's international department, despite his awareness that Allan Good, a manager of the department, was familiar with "important" people at Beogradska Banka. Likewise, neither Bauman nor anyone else at First Tennessee notified the SBA about the document rejection. Good also testified that a claimed discrepancy in documentation "[h]appens all the time," and that "there may have been a time or two" when First Tennessee had "insisted forcefully" that no such discrepancy existed, and a foreign bank had accepted its interpretation, thereby resolving the dispute. Likewise,

50-3 ¶*56*, which has not been cited by First Tennessee in the present case. Our analysis herein is confined to SOP 50-50-3 ¶*76(a)*. Under that regulation, it is not necessary for a loss on an SBA-backed loan to be traceable, with certainty, to First Tennessee's negligent servicing. *Valley Nat'l Bank*, 918 F.2d at 132-33. Insofar as First Tennessee seeks to apply the Seventh Circuit's ruling to SOP 50-50-3 ¶*76(a)*, which relieves the SBA from its obligation if the lender's actions may have caused a substantial loss, we find *Sanders* to be in direct conflict with the express language of the regulation. Therefore, we decline to read SOP 50-50-3 ¶76(a) as requiring proof that First Tennessee's deficient loan servicing actually resulted in a substantial loss to the SBA.

First Tennessee next argues that the record does not support a finding that its administration of the Telware loan was *substantially* negligent, as required by SOP 50-50-3 ¶76(a). Rather, the bank argues, "only in hindsight, could the choices made by First Tennessee be questioned in light of the unjustified refusal by Beogradska Banka to honor the letter of credit." We find this argument to be unpersuasive. Asking whether a lender was "substantially negligent," or whether it "substantially complied" with a loan guaranty agreement, is simply another way of asking whether the lender "materially breached" the agreement. *Cf. Heritage Bank & Trust Co.*, 906 F.2d at 300-01.[17]

In the present case, the district court determined that First Tennessee had materially breached the loan guaranty agreement by (1) failing to review Telware's documents, and

---

[17]In any event, the record evidence would support a finding that First Tennessee had serviced the Telware loan in a substantially negligent manner, and that it had materially breached the loan guaranty agreement. As the district court noted, after discovering Beogradska Banka's dishonor of the letter of credit and accompanying documents, First Tennessee representative Deryl Bauman essentially took *no* action, relying instead upon Telware to resolve the dispute. We agree with the district court's assessment that "prudent bankers, at a minimum, follow up in some way when letters of credit are dishonored for a discrepancy in the documents."

At trial, Bauman testified that his only action, upon discovering Beogradska Banka's rejection of the documents, was to speak with Fatima Telware, who assured him that she would handle the problem. Bauman did not approach First Tennessee's international department, despite his awareness that Allan Good, a manager of the department, was familiar with "important" people at Beogradska Banka, both in Belgrade and New York, and had visited them in person. Additionally, neither Bauman nor anyone else at First Tennessee notified the SBA about Beogradska Banka's rejection of the documentation. In his trial testimony, Good stated that First Tennessee's international department would have been interested in assuring that Telware's documentation was correct. He noted, however, that his department had no knowledge of First Tennessee's interest in the Telware bean transaction, because it did not receive notification from Bauman. Good also testified that a claimed discrepancy in documentation "[h]appens all the time" upon the initial presentation of a letter of credit. He added that "there may have been a time or two" when First Tennessee "insisted forcefully" that no such discrepancy existed, and a foreign bank acceded to its interpretation, thereby resolving the dispute. Good attributed such past successes in part to First Tennessee's reputation as a bank that does international work. Good also testified, however, that First Tennessee could not have forced Beogradska Banka to accept the documentation or to pay Telware.

The record also contains testimony from James E. Byrne, an attorney and law professor who testified at trial as an expert witness for First Tennessee. Byrne agreed that "from time to time" one bank can dispute a document discrepancy, resolve the problem, and obtain payment on a letter of credit. He added, however, that "[i]t doesn't happen all that often." Finally, Peter Iorlano testified as an expert witness for the SBA. Iorlano worked in the international departments of various banks from 1950 to 1997. His responsibilities included letter of credit supervision, loan servicing, document review and collection, and overseeing import-export transactions. Iorlano testified that a document presenter is

notified of an alleged discrepancy seventy to seventy-five percent of the time when documents are first presented in a letter-of-credit transaction. He also explained that a lending bank such as First Tennessee has a financial interest in such documents. Therefore, according to Iorlano, such a bank should personally handle the presentation of documents to a foreign bank. Additionally, Iorlano recalled instances in which a paying bank initially had claimed a document discrepancy, yet later had honored a letter of credit, following a "strenuous objection" by the document-presenting bank. Iorlano explained that after disputing a document discrepancy, a bank such as First Tennessee might need to speak with higher-level individuals at the foreign bank in order to obtain document approval. He also testified that other available options include: (1) having a vice-president of the document-presenting bank communicate personally with contacts at the foreign bank, or elsewhere in the foreign country, in an effort to assert some pressure; (2) pressuring any representatives of the foreign bank who might be located in the United States; or (3) presenting the dispute to an international banking organization for its review and assistance. According to Iorlano, a bank's international department is best suited to address document discrepancies in a manner that might persuade a foreign bank to accept the documents and to honor a letter of credit. Consequently, he opined that First Tennessee had acted imprudently by failing to take any of the foregoing steps and by allowing Telware to interact with Beogradska Banka.

On June 15, 1998, the district court entered a judgment in favor of the SBA. In its decision, the court first reasoned that SBA rules and regulations placed the burden of proof upon First Tennessee to establish its "substantial compliance" with the terms of the loan guaranty agreement. The district court then determined that First Tennessee had breached its contractual obligations to the SBA in two ways: (1) by failing to review any of the relevant documents until after the letter of credit had expired; and (2) by failing to take any action to protect its interests, or the SBA's interests, after Beogradska Banka initially had dishonored the letter of credit and

failure of a lending bank to service its loan in a prudent manner, if a substantial loss on the loan *may have* resulted. In so ruling, the court reasoned:

. . . The Bank contends that the loss on the loan would have resulted even if it had serviced the loan in the manner found wanting by the trial court. According to plaintiff, the Bank could not have prevented the ultimate loss on the loan by performing the various acts cited by the trial court, because the only reasons for the failure of Eagle Limousin were Miller's dishonesty and the inherent risk in this experimental venture.

This defense must fail for several reasons. First, the language relied upon by the Bank states that the SBA will be excused of liability if the negligent conduct "*may* result in a substantial loss on the loan." 13 C.F.R. § 120.202-5(a) (emphasis added). In addition, S.O.P. 50-50-3 ¶ 76(a) emphasizes that an actual loss is not necessary, stating that "[t]he combination of a substantial failure by participant which results, *or may result*, in a substantial loss" is a predicate to an SBA denial of liability. Thus, the trial court's interpretation of the terms of the agreement on this issue is supported by the regulations forming a part of the agreement. Under the SBA regulations and policy statements relied upon by the parties, it is sufficient if the lender's actions are of such a nature that they may be expected to result in a substantial loss on the loan.

*Id.* at 132-33.

In response to the foregoing analysis, First Tennessee cites *E. Ill. Trust & Sav. Bank v. Sanders*, 826 F.2d 615 (7th Cir. 1987), for the proposition that the SBA may refuse to honor a guaranty agreement only when a lender's imprudent conduct *actually results* in a substantial loss. In *Sanders*, the court read SOP 50-50-3 ¶56 as outlining "two prerequisites to repudiating a guaranty: a substantial failure of compliance and a resulting substantial loss on the loan." *Id.* at 617. Notably, however, the Seventh Circuit's analysis concerned SOP 50-

to protect the interests of the SBA.  The agreement also required the bank's conduct with respect to SBA-guaranteed loans to conform with that of prudent lenders generally. Notably, 13 C.F.R. § 120.202-5 releases the SBA from its guaranty obligation if imprudent loan servicing *may* have resulted in a substantial loss on a loan. Similarly, SOP 50-50-3 provides that "substantially negligent" loan servicing by a lender bank will release the SBA from its guaranty obligation if such servicing *may* have resulted in a substantial loss.

The foregoing rules and regulations support the district court's determination that the SBA was released from its guaranty obligation if First Tennessee's actions *may have* resulted in a substantial loss on the Telware loan. Indeed, the text of SOP 50-50-3 and 13 C.F.R. § 120.202-5 expressly states that actions by a lender which *may result* in a substantial loss will justify the SBA's refusal to honor its guaranty agreement.[16]    In short, we find nothing in the parties' agreement or the applicable regulations which would suggest that proof of actual loss, attributable to First Tennessee's poor servicing of the Telware loan, was required in order to release the SBA from its guaranty obligation.

Our interpretation of SOP 50-50-3 and 13 C.F.R. § 120.202-5 is consistent with the conclusion reached by the Tenth Circuit Court of Appeals in *Valley Nat'l Bank v. Abdnor*, 918 F.2d 128 (10th Cir. 1990). In that case, the court read the aforementioned regulations and policy statements as releasing the SBA from its guaranty agreement, upon the

---

[16]As noted, *supra*, the district court found that First Tennessee's inaction "may have, but likely did not," contribute to the loss on the Telware loan.  Stated differently, the district court appears to have concluded that First Tennessee's inaction probably did not contribute to the loss. Under the regulations discussed above, however, the finding by the district court is sufficient to release the SBA from its guaranty obligation. Under the regulations, the SBA is released from the guaranty agreement if First Tennessee's inaction *may* have contributed to the loss on the Telware loan.  The regulations do not require proof, by the preponderance of the evidence, that First Tennessee did contribute to the loss.

supporting documentation.    Finally, the district court concluded that First Tennessee's breach of the guaranty agreement was a "material" one, thereby relieving the SBA of its obligation to repurchase the defaulted loan.

## II.  *Analysis*

First Tennessee argues on appeal that the district court's ruling is erroneous in two respects.  First, the bank contends that the lower court erred by requiring it to prove its substantial compliance with the terms of the loan guaranty agreement, rather than requiring the SBA to prove the bank's non-performance of its obligations.  Second, First Tennessee contends that the district court erred by concluding that it had materially breached the guaranty agreement by (1) failing to review the documents that Telware had presented to Beogradska Banka and (2) failing to act after the Yugoslavian bank had initially rejected Telware's documentation and had dishonored the letter of credit.  With respect to the burden of proof issue, First Tennessee contends that state law placed the burden upon the SBA to prove the bank's failure to perform in accordance with the guaranty agreement.  Concerning the purported materiality of its breach, First Tennessee insists that its actions or omissions could not have caused Beogradska Banka to reject Telware's documentation or to dishonor the letter of credit.  In support, First Tennessee notes that Telware's documents actually complied with the requirements of the letter of credit.  Therefore, it reasons that its failure to review those documents could not, and did not, prejudice the SBA.  The bank then insists that nothing it could have done would have changed Beogradska Banka's "arbitrary" decision to dishonor the letter of credit.  We will address the foregoing issues seriatim.

### A.  *Allocation of the Burden of Proof*

First Tennessee contends that the district court improperly characterized its performance under the guaranty agreement as a condition precedent to the SBA's obligation to repurchase the defaulted Telware loan.  According to First Tennessee, the court should have construed its alleged non-

performance as an affirmative defense for which the SBA bore the burden of proof. Whether a party's nonperformance constitutes a failed condition precedent or an affirmative defense is a question of law to be reviewed *de novo*. *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999). Likewise, a district court's allocation of the burden of proof is a question of law subject to *de novo* appellate review. *In re Sorah*, 163 F.3d 397, 400 (6th Cir. 1998), citing *In re Calhoun*, 715 F.2d 1103, 1111 (6th Cir. 1983).

In support of its contention that the SBA bore the burden of proving non-performance under the guaranty agreement, First Tennessee first notes that the agency pleaded the bank's breach of the agreement as an affirmative defense. First Tennessee then argues, and the district court correctly found, that federal common law typically governs SBA loan guaranty agreements. *See, e.g., United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1367 (7th Cir. 1992); *Pittsburgh Nat'l Bank v. Abdnor*, 898 F.2d 334, 338 (3rd Cir. 1990); *First Interstate Bank of Idaho v. Small Bus. Admin.*, 868 F.2d 340, 343 (9th Cir. 1989).

Next, the bank contends that federal courts must adopt state law as the federal common law applicable to SBA loan disputes. In support, First Tennessee relies upon *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979). In *Kimbell Foods*, the Court granted certiorari to decide whether contractual liens arising from SBA loan programs take precedence over private liens "in the absence of a federal statute setting priorities." *Id.* at 718. The Court applied federal common law to resolve the issue. *Id.* Finding no need for uniform federal rules of priority, however, the Court adopted relevant state law as the applicable federal common law. *Id.* at 729. In light of *Kimbell Foods*, First Tennessee contends that state law necessarily governs the allocation of the burden of proof in the present case. The bank then notes that, in a Tennessee breach of contract case, a defendant bears the burden of proving a plaintiff's non-performance of the contract. *See Life Care Centers of Am., Inc. v. Charles Town*

*substantially* in compliance with the Authorization or servicing in a *substantially* negligent manner, either of which may result in a substantial loss on the loan. The combination of a substantial failure by participant which results, or may result, in a *substantial* loss is necessary before a "denial" can be sustained.

Finally, with respect to export revolving lines of credit ("ERLC"), such as the Telware loan at issue, SOP 50-10-2 provides: "It is anticipated that the lender's commercial loan officer will work with its international department (or with the international division of its correspondent) in the implementation of an ERLC. The complexities of export finance warrant the services of banking experts in this field."

After reviewing the foregoing regulations, the district court determined that First Tennessee had materially breached its loan guaranty agreement with the SBA. In reaching this conclusion, the court reasoned that Beogradska Banka was the "initial cause" of Telware's default, given its unjustified dishonor of the letter of credit. The court also found that First Tennessee's inaction following the Yugoslavian bank's rejection of Telware's documents "may have, but likely did not, further cause the loss." Nevertheless, the district court interpreted the guaranty agreement, 13 C.F.R. § 120.202-5, and SOP 50-50-3 as relieving the SBA from liability if First Tennessee's conduct *may have* resulted in a substantial loss. Although the lower court found no evidence suggesting that First Tennessee could have forced Beogradska Banka to honor the letter of credit, it determined that "additional prudent action may well have helped." Specifically, the court reasoned that First Tennessee had imprudently increased the SBA's "risk of loss" when it failed to review Telware's documents, and when it failed to take any action whatsoever following Beogradska Banka's initial dishonor of those documents.

We find no error in the district court's conclusion. As noted above, the loan guaranty agreement required First Tennessee to act, consistent with prudent banking practices,

In order to assess the correctness of the district court's ruling, we first must identify the nature of the bank's obligations under the terms of its guaranty agreement with the SBA. Those obligations emanate from two sources: (1) the parties' loan guaranty agreement itself; and (2) the Telware loan authorization issued by the SBA. The loan guaranty obligated First Tennessee to close and disburse all SBA-guaranteed loans in accordance with the terms and conditions of the applicable loan authorization, and to take all actions, consistent with prudent closing practices, necessary to protect the interests of the SBA.[14]   The guaranty agreement also obligated First Tennessee to follow the loan servicing standards employed by prudent lenders generally, and it incorporated, by reference, the SBA's rules and regulations. One of those regulations, 13 C.F.R. §120.202-5, releases the SBA from liability on a loan guaranty unless the lender has substantially complied with all of the provisions of the SBA's regulations and the loan guaranty agreement.[15]   Section 120.202-5 also releases the SBA from liability if the lender fails to service its loan in a prudent manner, such that a substantial loss on the loan may result. In addition, the SBA has promulgated standard operating procedures ("SOPs") which address its obligation to repurchase a guaranteed loan and have the force and effect of law. *First Nat'l Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185 (6th Cir. 1991); *First Nat'l Bank of Louisa, Ky. v. United States*, 6 Cl. Ct. 241 (1984). One such regulation, SOP 50-50-3, sets forth the circumstances under which the SBA may refuse to honor a guaranty:

> The basic prerequisites for denial of liability are failure on the part of the participant to close/disburse

---

[14]Likewise, the Telware loan authorization incorporated, by reference, all provisions of the First Tennessee-SBA loan guaranty agreement.

[15]As noted, supra, §120.202-5 has now been replaced by 13 C.F.R. § 120.524, which imposes essentially the same requirements upon a lender such as First Tennessee.

*Assoc. Ltd. P'ship*, 79 F.3d 496 (6th Cir.1996).[4]  Similarly, applying Tennessee law, a panel of this court recently concluded in *Safeco Ins. Co. of America v. City of White House, Tenn.*, 191 F.3d 675 (6th Cir. Sept. 1999),[5] that a plaintiff's failure to satisfy a contractual condition precedent is an affirmative defense on which the defendant bears the burden of proof.[6]   In its argument on appeal, First

---

[4]In *Life Care Centers*, this court concluded that "the law in Tennessee is completely silent as to the allocation of burdens of proof in a breach of contract case." *Life Care Centers*, 79 F.3d at 513. We then reasoned:

> It is clear that, under Tennessee law, a plaintiff cannot recover for a breach of contract if he has not fully performed under the contract. . . . However, this does not mean that the plaintiff has the burden of proof on the issue of his own performance. . . . In the breach of contract context it makes no sense to require the plaintiff to plead and prove the performance of a contract as an essential fact and element of the plaintiff's cause of action.

*Id.*  We cited two reasons for reaching the foregoing conclusion: (1) "from a judicial economy perspective it is wholly impractical to impose upon the plaintiff the burden of peremptorily having to prove his own performance under those sections of a contract to which there is no challenge"; and (2) "allocating the burden of such an affirmative defense on the plaintiff would allow the defendant to sidestep certain relevant legal principles under Tennessee law." *Id.* at 513-514.

[5]Because *Safeco* was decided well after the completion of briefing and oral argument in the present appeal, it has not been addressed by either party.

[6]Imposing the burden of proof upon a defendant to establish a plaintiff's non-performance of a condition precedent appears to be at odds with the rule followed in most jurisdictions, including Tennessee. *See, e.g., McReynolds v. Am. Progressive Corp.*, 1991 WL 24891 (Tenn. Ct. App. March 1, 1991) ("The plaintiff overlooks the fact, however, that the defendants did not carry the burden of proving that the condition precedent did not occur. The plaintiff must prove that the condition precedent was satisfied in order to establish that the defendant's liability was triggered under the contract."); *Clark v. Gilliam Candy Co., Inc.*, 1991 WL 1059 (Tenn. Ct. App. Jan. 9, 1991) ("There is not a scintilla of

evidence in this record that the company is able to repay the $65,000. This is a condition precedent to the maturing of the obligation. Plaintiff has the burden of showing that the obligation has matured and that defendant has failed to meet that obligation."); *Abni Joint Venture v. Kinnard*, 1987 WL 7968 (Tenn. Ct. App. March 19, 1987) ("The party seeking to enforce a contract has the burden of proving that he has performed conditions precedent to liability of the defendant."); *Margrave v. K.P. Channabassappa*, 1987 WL 19444 (Tenn. Ct. App. Nov. 6, 1987) ("The burden was upon the plaintiff to show that he had the ability to perform all of the conditions precedent . . . . Plaintiff has failed to prove that he had the ability to perform. Therefore, even assuming a breach of the contract by defendants, plaintiff has failed to show that he had the ability to perform all of the conditions precedent. He is not entitled to damages for defendants' repudiation."); *John H. Moore & Sons v. Adams*, 45 Tenn. App. 364, 324 S.W.2d 499 (1959) ("The defendant's promise to furnish the extra brick and to pay the cost of laying them was conditioned upon (1) the brick being undersized, and (2) upon it being determined that, because they were undersized, an additional quantity of brick were required to complete the job. Complainant, suing on such promise, had the burden of alleging and proving both the condition and the performance of it."); *see also Mellon Bank v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1008 (3rd Cir. 1980) (applying Pennsylvania law) ("Therefore, the district court was in error when it placed on Aetna the burden of proving the insolvency of the borrowers as a defense to the action. (footnote omitted). Mellon had the burden of showing that the borrowers were solvent as a condition precedent to recovery for breach of Aetna's promise."); *Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978), *cert. denied*, 441 U.S. 923 (1979) (applying Ohio law) ("Moreover, inasmuch as section 2-607 operates as a condition precedent to any recovery, the burden of proof is on the plaintiff to show that notice was given within a reasonable time."); *Nat'l Elec. Mfrs. Assoc. v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 826 (4th Cir. 1998) (citing 19 Couch on Insurance 2d § 79:342 for the proposition that "conditions precedent must be proved by plaintiff who seeks to recover on insurance policy"); *Raymond v. Marks*, 116 F.3d 466, 1997 WL 345984 (2nd Cir. June 24, 1997) (applying New York law) ("Where there is a condition precedent to performance, the party seeking to enforce the contractual obligation bears the burden of proof.").

In *Safeco*, however, a panel of this court cited *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990), for the proposition that, under Tennessee law, a plaintiff's failure to comply with a condition precedent is an affirmative defense, on which the defendant bears the burden of proof. In *Harlan*, the Tennessee appellate court relied upon Tenn.R.Civ.P. 9.03 when concluding that "[t]he non-performance of a

find the *Daubert* reliability factors unhelpful in the present case, which involves expert testimony derived largely from Iorlano's own practical experiences throughout forty years in the banking industry. Opinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation.[13] Consequently, we find no merit in First Tennessee's argument that Iorlano's testimony lacked sufficient indicia of reliability, and therefore was inadmissible, under the guidelines established by *Daubert*. The fundamental objective when considering the admissibility of "expert" testimony is "to ensure the reliability and relevancy" of that testimony. *Id.* at 152. As set forth above, the district court possessed an adequate basis for concluding that Iorlano's testimony was both reliable and relevant. Accordingly, we find no abuse of discretion in the district court's decision to admit his testimony.

## 2. *Materiality of First Tennessee's Conduct*

In a final argument, First Tennessee insists that it did not materially breach its loan guaranty agreement with the SBA. The district court reached a contrary conclusion, however, holding that First Tennessee had failed to act in a prudent manner and, therefore, had breached the loan guaranty agreement, by (1) failing to review any of Telware's documentation, and (2) failing to take any action after Beogradska Banka's initial dishonor of the letter of credit. The district court deemed the foregoing breaches to be material, and it found the SBA under no obligation to repurchase the defaulted Telware loan.

---

[13]This is not to say, however, that *Daubert's* factors will never serve as reasonable measures of reliability when expert testimony is based upon personal knowledge or experience. To the contrary, the *Kumho* Court recognized that *Daubert's* list of factors may or may not be pertinent in assessing expert testimony of any type, regardless of whether such testimony is based upon scientific, technical, or other specialized knowledge.

*Daubert*] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded. Such a result truly would turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific evidence, on its head." *Id.* at 1158. Indeed, even the *Berry* court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that *Daubert* is "only of limited help" in assessing technical or experiential expertise. *Berry*, 25 F.3d at 1349. Consequently, in *Jones* we declined the appellant's invitation to apply the factors outlined in *Daubert* to testimony involving a non-scientific field. *Jones*, 107 F.3d at 1158.

Following our ruling in *Jones*, the Supreme Court clarified the applicability of the so-called "*Daubert* factors" to non-scientific evidence in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). In *Kumho*, the Court reaffirmed *Daubert's* central holding that a trial judge's "gatekeeper" function applies to *all* expert testimony, regardless of whether such testimony is based upon scientific, technical, or other specialized knowledge. *Id.* at 141, 147-49. With respect to the individual factors enumerated in *Daubert*, the *Kumho* Court held that trial courts may consider such factors when assessing the reliability of all types of expert testimony. *Id.* at 149-52. The Court stressed, however, that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141. In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150. "[W]hether *Daubert* 's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

After reviewing Iorlano's trial testimony, we cannot say that the district court abused its discretion by allowing him to testify as an expert witness. In reaching this conclusion, we

Tennessee contends that the district court properly acknowledged *Life Care Centers* as the "general law on contracts in Tennessee," yet inexplicably failed to follow its allocation of the burden of proof.

Finally, First Tennessee cites *Brunswick Bank & Trust Co. v. United States*, 707 F.2d 1355 (Fed. Cir. 1983), in support of its argument that the SBA bore the burden of proof. In that case, the plaintiff bank sought reimbursement under the terms of a loan guaranty provided by the federal Farmers Home

---

condition precedent is an affirmative defense that must be *pled*" by the defendant. *Harlan*, 796 S.W.2d at 957 (Emphasis added). Notably, Rule 9.03, which mirrors Fed.R.Civ.P. 9(c), merely imposes a *pleading* burden upon a defendant. Like its federal counterpart, it provides that a plaintiff may aver generally that all conditions precedent have been performed. If a defendant wishes to contest the issue, he or she must deny the performance of a condition precedent with particularity. Tenn.R.Civ.P. 9.03; Fed.R.Civ.P. 9(c). Neither the federal rule nor the Tennessee rule places the burden of *proof* upon the defendant to establish the non-occurrence of a condition precedent. To the contrary, once the defendant has put the issue in contest, the burden of proof rests with the plaintiff. *See, e.g., Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982) ("[A] Plaintiff must generally allege in his complaint that 'all conditions the institution of the lawsuit have been fulfilled.' Fed.R.Civ.P. 9(c). If the defendant doubts the veracity of the plaintiff's allegation, in whole or in part, then the defendant may deny 'specifically and with particularity' that the preconditions have not been fulfilled. *Id.* The plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied.").

A panel of this court reached a contrary conclusion in *Safeco*, however, and we are not at liberty to depart from that ruling. *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir.1985) ("A panel of this Court cannot overrule the decision of another panel."). Consequently, for purposes of our analysis herein, we must conclude that, under Tennessee law, the SBA would bear the burden of proving First Tennessee's non-performance of a condition precedent. For reasons to be set forth more fully, *infra*, however, we reject First Tennessee's argument that state law supplies the applicable rule of decision. Rather, as we will explain, pertinent SBA regulations plainly allocate the burden of proof to First Tennessee. Therefore, *Safeco* does not control the outcome of the instant case.

Administration ("FmHA"). *Id.* at 1359. The FmHA refused to honor the guaranty, however, arguing, *inter alia*, that the bank had negligently serviced the loan at issue. *Id.* at n. 6. At trial, the U.S. Court of Claims placed the burden of proof upon the bank to prove that it did not negligently service the loan. *Id.* at 1360. Upon appeal, the Federal Circuit held that the trial court had misallocated the burden of proof. In so ruling, the appellate court construed the parties' "Lender's Agreement" as providing the FmHA with an affirmative defense to liability on the guaranty.[7] Therefore, the court held that the FmHA bore the burden of proof. *Id.* First Tennessee insists that the same rationale "wholly applies to this case."

Upon review, however, we cannot agree that the district court misallocated the burden of proof. As a threshold matter, the fact that the SBA initially raised the issue of First Tennessee's non-performance as an affirmative defense is not dispositive. We look to the law, not to the pleadings, when determining where the burden of proof rests. Furthermore, we find unpersuasive First Tennessee's argument that state contract law governs the outcome of the present dispute. As noted above, it is true that general federal common law typically applies to disputes involving SBA loan guarantees. *First Nat'l Bank of Cicero*, 957 F.2d at 1367; *Pittsburgh Nat'l Bank*, 898 F.2d at 338; *First Interstate Bank of Idaho*, 868 F.2d at 343. It is equally true that the Supreme Court in *Kimbell Foods* looked to relevant state law when fashioning the federal common law applicable to SBA lien priorities. *Kimbell Foods*, 440 U.S. at 729. Nor do we quarrel with First Tennessee's argument that, under controlling Sixth Circuit precedent interpreting the Tennessee common law of

---

[7] The pertinent language of the Lender's Agreement in *Brunswick Bank* provided that the government's guaranty obligation "'was supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which the Lender [bank] has actual knowledge . . . [,] [and is] unenforceable by the Lender to the extent of any loss occasioned by . . . use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security . . . .'" *Brunswick Bank*, 707 F.2d at 1360.

is sufficiently "reliable." Such factors include: (1) "whether a theory or technique . . . can be "and has been tested"; (2) "whether the theory or technique has been subjected to peer review or publication"; (3) "the known or potential rate of error"; and (4) "general acceptance." *Id.* at 593-94. Although *Daubert* specifically dealt with "scientific" evidence, we have recognized that the "gatekeeper" analogy "'is applicable to all expert testimony offered under Rule 702.'" *United States v. Thomas*, 74 F.3d 676, 681 (6th Cir.), *cert. denied*, 517 U.S. 1162 (1996), *abrogated on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995); *Cook v. American S.S. Co.*, 53 F.3d 733, 738 (6th Cir. 1995) (noting that a duty comparable to *Daubert's* "gatekeeping" function "is imposed upon a trial court when the subject of the proposed opinion testimony is not 'scientific' knowledge, but 'technical, or other specialized knowledge'"), *abrogated on other grounds by Joiner*, 522 U.S. 136.

In *Berry*, 25 F.3d at 1350-51, this court adopted the aforementioned four *Daubert* factors as an analytical framework when assessing the reliability of proposed *non-scientific* expert testimony. Utilizing those same factors (i.e., testing of the expert's theory, peer review and publication, rate of error, and general acceptance) in the present case, First Tennessee contends that the SBA failed to demonstrate that technically valid reasoning and methodology supported Iorlano's opinions. Therefore, the bank asserts that his so-called "expert" testimony was not proven to be reliable.

We cannot agree. Contrary to First Tennessee's argument, the fact that Iorlano's opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir.), *cert. denied*, 521 U.S. 1127 (1997), this court recognized that the four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the

First Tennessee's traditional lender-borrower relationship with Telware, but also the scope of its obligation to monitor Telware's transaction with Beogradska Banka, and its obligation (and ability) to intercede on Telware's behalf, particularly after discovering that the Yugoslavian bank had dishonored the letter of credit and had rejected Telware's documentation. Based upon Iorlano's testimony, we find no abuse of discretion in the district court's determination that he possessed the requisite expertise to offer his opinion about these issues. Iorlano's testimony was both relevant and sufficiently reliable to support the district court's ruling. Finally, to the extent that Iorlano may have lacked familiarity with some aspects of banking relationships, the district court correctly reasoned that such unfamiliarity merely affected the weight and credibility of his testimony, not its admissibility. *Morales*, 151 F.3d at 516 (reasoning that "the jury was free to give [an expert's] testimony as much credence as it felt the testimony deserved, particularly in light of Defendant's cross-examination exposing [his] lack of familiarity with the given topics"); *see also Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) ("Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify.").

Finally, First Tennessee suggests that Iorlano's testimony was not based upon "technically valid reasoning or methodology," even if he was qualified to offer such testimony. We find this argument to be unpersuasive. In support of its assertion, the bank draws from the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny. In *Daubert*, the majority recognized that the federal courts fulfill an important "gatekeeping" function, guaranteeing that evidence is both relevant and reliable. *Id.* at 589. The *Daubert* Court then suggested a non-exclusive list of factors for courts to consider when deciding whether proposed scientific expert testimony

contracts, the SBA would bear the burden of proving the bank's non-performance under the guaranty agreement, regardless of whether such non-performance is characterized as a failed condition precedent or as an affirmative defense. *Life Care Centers*, 79 F.3d at 513; *Safeco*, 191 F.3d at 682.

First Tennessee's arguments fail, however, because none of the foregoing authorities control the outcome of the present litigation. In its written decision, the district court expressed its belief that pertinent SBA regulations explicitly imposed the burden of proof upon First Tennessee. After reviewing those regulations, which were incorporated into the parties' guaranty agreement, we find no error in the district court's conclusion. It is well settled that "[a] government agency's regulations that have been published in the Code of Federal Regulations 'have the force and effect of law . . . .'" *Nationwide Bldg. Maint., Inc. v. Reich*, 14 F.3d 1102, 1105 (6th Cir. 1994), quoting *Moody v. United States*, 774 F.2d 150, 156 (6th Cir. 1985), *cert. denied*, 479 U.S. 814 (1986). In the present case, the district court relied in part upon 13 C.F.R. §120.202-5, which governs the SBA's obligation to honor its loan guarantees and provides:

> SBA shall be released from obligation to purchase its share of the guaranteed loan unless the Lender has substantially complied with all of the provisions of these regulations, the Guaranty Agreement and the Loan Authorization . . . .[8]

The district court interpreted the foregoing portion of the Code of Federal Regulations as imposing a burden upon First Tennessee to prove its "substantial compliance" with the

---

[8] In its written decision, the district court quoted § 120.202-5, while recognizing that it has been replaced by § 120.524, which contains somewhat similar language. In relevant part, § 120.524 now provides that the "SBA is released from liability on a loan guarantee . . . if" certain events occur. To the extent that the two regulations differ, however, we base our analysis, as did the district court, upon the language of § 120.202-5, which was in effect when the SBA refused to honor its loan guaranty.

terms of the loan guaranty agreement. In other words, the district court read 13 C.F.R. § 120.202-5 to mean that the SBA's obligation to repurchase the defaulted Telware loan did not arise *unless* First Tennessee established its performance under the contract. Upon review, we agree that § 120.202-5 allocated the burden of proof to the bank to demonstrate its substantial compliance with the terms of its agreement with the SBA.[9] The regulation provides that the SBA *shall be released* from its guaranty obligation *unless* the bank substantially complies with its various obligations. The only reasonable interpretation of the foregoing language is that it places the burden upon the lending institution, here First Tennessee, to make a threshold showing that it has serviced its guaranteed loan in a commercially reasonable manner and otherwise has complied with the terms of the parties' agreement and the regulations.[10] Therefore, insofar

---

[9] In their respective briefs, the parties dispute whether the requirement of "substantial compliance" under § 120.202-5 should be characterized as providing the SBA with a potential affirmative defense to liability on its loan guaranty, or as setting forth a condition precedent to the SBA's guaranty obligation. As noted above, a plaintiff typically bears the burden of proving its satisfaction of a condition precedent, whereas a defendant ordinarily bears the burden of establishing the existence of an affirmative defense. As we also have recognized, however, under Tennessee law, the non-occurrence of a condition precedent *is* an affirmative defense, and the defendant bears the burden of proof on the issue. *Safeco*, 191 F.3d at 682. Thus, our holding that First Tennessee bore the burden of proof with respect to its "substantial compliance" turns not upon the label that we affix to the requirements set forth in § 120.202-5, but upon our conclusion that the regulation specifically allocates the burden of proof. As noted above, the only reasonable interpretation of § 120.202-5 is that it imposes the burden of proof upon the plaintiff, regardless of whether its requirements are characterized as a "condition precedent" or as an "affirmative defense." Given that the federal regulation unambiguously allocates the burden of proof, Tennessee common law simply has no place in our analysis.

[10] *Cf. Fredenburg v. Contra Costa County Dept. of Health Serv.*, 172 F.3d 1176, 1182 (9th Cir. 1999) (construing a portion of the Americans with Disabilities Act, 42 U.S.C. § 12112(d)(4)(a), which prohibits an employer from inquiring to whether an individual is disabled "*unless* such examination or inquiry is shown to be job-related and consistent with

---

document collection, and loan servicing, "which handled the refinancing of letters of credit and bankers' acceptance." Iorlano also testified that his banking career exposed him to all aspects of an international banking transaction. In his capacity as the manager of a letter of credit department, he became familiar with how banks in First Tennessee's position handled letter of credit financing transactions.

After hearing the foregoing testimony concerning Iorlano's qualifications, the district court stated:

> I think he has specialized knowledge that will assist the trier of fact in understanding the evidence, and any weaknesses in his background will go to the weight to be accorded to his opinion.
> [Plaintiff's counsel] is free to examine him in that regard.
> This gentleman has managed letter of credit departments and worked in letter of credit departments in a number of large banks. He is certainly familiar with the process of honoring and dishonoring letters of credit and of banks' approaches on those.
> I think he has sufficient specialized knowledge to be helpful in understanding this process. That doesn't mean I will necessarily believe everything he tells me. He is qualified to render an opinion.

We find no error, much less an abuse of discretion, in the district court's assessment of Iorlano's qualifications as an expert witness. As it did in the trial court, First Tennessee insists on appeal that Iorlano lacked expertise with respect to the issue of whether it "managed its relationship with one of its borrowers with due care and prudent bank knowledge." According to the bank, Iorlano possessed absolutely no experience in lender-borrower relationships and, therefore, was unqualified to offer an opinion about whether First Tennessee had followed prudent banking practices with respect to servicing the Telware loan. In our view, however, First Tennessee takes an unduly narrow approach to defining the central issue at trial. This litigation concerns not only

In the present case, First Tennessee does not suggest that Iorlano offered "scientific" expert testimony, and we find nothing in the record to support such a conclusion. Rather, Iorlano's testimony falls under the "technical or other specialized knowledge" component of Rule 702. In essence, Iorlano opined at trial that First Tennessee imprudently took itself "out of the loop" by allowing Telware to handle the dispute with Beogradska Banka. As noted, *supra*, Iorlano identified various problems associated with a lender such as First Tennessee allowing its client to negotiate a letter of credit and document dispute on its behalf. Iorlano also identified several steps that First Tennessee could have taken in an attempt to persuade Beogradska Banka to honor the letter of credit. Finally, Iorlano testified that such steps might have made a difference in the present case.

After reviewing the record, we agree that the foregoing testimony assisted the district court in determining whether First Tennessee had acted as a prudent lender with respect to the Telware loan. We also find no abuse of discretion in the district court's determination that Iorlano was qualified to offer his opinion on the foregoing issue, by virtue of his specialized knowledge, skill, experience, training, or education. Iorlano testified that he began his banking career in 1950, examining letters of credit and related documents. He later joined the international office of a different bank, eventually supervising employees who provided various letter of credit services. Later, Iorlano served as the manager of an entire letter of credit department, and then as a vice president in charge of a letter of credit department and a payment and receipt department. Before taking an early retirement, Iorlano joined the Union Bank of California as a vice president and head of its large international department. In that capacity, he supervised up to forty employees from various departments, performing letter of credit import and export functions,

---

also is consistent with *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), which also will be discussed, *infra. Id.* As a result, the recent amendment to Rule 702 does not alter the standard for evaluating the admissibility of expert testimony in this case.

as § 120.202-5 might conflict with the Tennessee common law, we conclude that such inconsistent state law has no effect.[11] *See Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) (recognizing that "federal regulations have no less pre-emptive effect than federal statutes"); *United States v. Jones*, 707 F.2d 1334, 1336 (11th Cir. 1983) (concluding that an SBA regulation preempted conflicting Georgia law). We also find the Tennessee common law of contracts inapplicable for a second reason, namely the parties' incorporation of the SBA regulations into the loan guaranty agreement. Given that the parties adopted the foregoing regulation by reference in their agreement, it governs their relationship to the exclusion of any conflicting common law principles, even assuming, arguendo, that the doctrine of preemption does not apply.

---

business necessity," as placing the burden on the employer to make the requisite showing) (Emphasis added).

Parenthetically, although we have rejected First Tennessee's argument that state law controls our analysis, we note that the courts of that state have interpreted similar "unless" statutory language as imposing the burden of proof upon a plaintiff. *See Little v. Nashville, Chattanooga and St. Louis Ry. Co.*, 39 Tenn. App. 130, 281 S.W.2d 284 (1954) (interpreting a statute which provided that no train engineer "shall be compelled to blow the whistle or ring the bell at any crossing, unless it is so designated [as a public crossing]" as placing the burden of proof upon the plaintiff to prove that the crossing had been so designated).

[11] The existence of 13 C.F.R. § 120.202-5 also distinguishes the present case from *Kimbell Foods*, 440 U.S. at 715, upon which First Tennessee relies. In *Kimbell Foods*, the Supreme Court applied the federal common law (which incorporated state commercial law as the federal rule of decision) to an SBA dispute regarding lien priorities *because no federal statute set such priorities*. In the present case, however, we need not resort to Tennessee law, via the federal common law, in order to resolve the burden of proof issue. As noted above, an SBA regulation, 13 C.F.R. § 120.202-5, allocated the burden of proof with respect to the agency's loan guaranty obligations. Consequently, we need not look to the federal common law to fill a void such as that which existed in *Kimbell Foods*.

Finally, we find unpersuasive First Tennessee's argument that *Brunswick Bank*, 707 F.2d at 1355, compels reversal of the district court on the burden of proof issue. Although *Brunswick Bank* bears some factual similarity to the present case, the Federal Circuit Court of Appeals construed language in a Lender's Agreement that differs from the language of 13 C.F.R. § 120.202-5, which we have been called upon to interpret in the instant case. Given that the *Brunswick Bank* court had no occasion to construe § 120.202-5, its allocation of the burden of proof upon the FmHA, under the terms of a different agreement, does little to advance First Tennessee's argument. For the reasons set forth above, we conclude that 13 C.F.R. § 120.202-5 placed the burden upon First Tennessee to demonstrate substantial compliance with the terms of the parties' agreement. Accordingly, we find no error in the district court's allocation of the burden of proof, and we reject the appellant's first argument.

### B. *Material Breach of the Guaranty Agreement*

First Tennessee next argues that the district court erred by finding that it had materially breached its guaranty agreement with the SBA. In particular, the bank contends that its failure to review the documents that Telware presented to Beogradska Banka did not constitute a material breach, contrary to the district court's conclusion. First Tennessee also argues that its failure to act after Beogradska Banka's initial dishonor of the letter of credit did not cause the SBA's loss or increase the risk of such a loss. Consequently, First Tennessee insists that its own action (or inaction) was immaterial to Telware's default. Finally, in connection with its materiality argument, First Tennessee contends that the district court erred by allowing Peter Iorlano, the SBA's expert witness, to testify at trial. The bank argues that Iorlano lacked the qualifications to offer valid expert testimony, and that his testimony was not based upon technically valid reasoning. As a means of analysis, we first will address the bank's arguments regarding the admissibility of Iorlano's testimony. After resolving that issue, we will determine whether the record supports a finding that First Tennessee

breached its agreement with the SBA and, if so, whether that breach was material.

### 1. *Admissibility of Iorlano's Expert Testimony*

In determining that First Tennessee did not act consistent with prudent banking standards, the district court relied largely upon the testimony of Iorlano, who the court found to be qualified as an expert witness. This court reviews a district court's decision to admit expert testimony for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir. 1998). Upon review, we find no abuse of discretion in the district court's decision to allow Iorlano's testimony.

Federal Rule of Evidence 702 sets forth the requirements for the admissibility of expert testimony. At the time of the district court's ruling, Rule 702 provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[12]

---

[12]Rule 702 was amended, effective December 1, 2000, to read as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The foregoing amendment to Rule 702 merely reflects the traditional *Daubert* inquiry, which will be discussed more fully, *infra*. See *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 n. 4 (6th Cir. 2001), *petition for cert. filed*, 69 U.S.L.W. 3791 (June 7, 2001). As amended, Rule 702