IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 23, 2017 Session

## CHAYCE COLLIER v. PERICLIS ROUSSIS, M.D., ET AL.

Appeal from the Circuit Court for Knox County
No. 2-562-12      William T. Ailor, Judge

No. E2016-01591-COA-R3-CV

Chayce Collier, a minor, by and through his natural parent and next friend, Kendall Collier ("Plaintiff") sued Periclis Roussis, M.D. and Fort Sanders Perinatal Center and Fort Sanders Regional Medical Center ("the Hospital") for injuries allegedly suffered by Plaintiff when his mother had an allergic reaction during labor. After trial before a jury, the Circuit Court for Knox County ("the Trial Court") entered judgment on the jury's verdict that Dr. Roussis was not negligent and that the nurses employed by the Hospital were not negligent and dismissed the suit. Plaintiff appeals to this Court raising several issues including whether the Trial Court erred in allowing the admission of previously undisclosed testimony from the nurses and a defense expert witness, among other things. We find and hold that the Trial Court erred in allowing the previously undisclosed testimony of the nurses and the defense expert witness. We, therefore, vacate the Trial Court's judgment and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Joe Bednarz, Sr. and Joe Bednarz, Jr., Hendersonville, Tennessee, for the appellant, Chayce Collier, a minor, by and through his natural parent and next friend, Kendall Collier.

James G. O'Kane and Raymond G. Lewallen, Jr., Knoxville, Tennessee, for the appellee, Periclis Roussis, M.D.

Rick L. Powers and Rachel Park Hurt, Knoxville, Tennessee, for the appellee, Fort Sanders Perinatal Center and Fort Sanders Regional Medical Center.

# OPINION

## Background

In June of 2009, Plaintiff's mother, Kendall Collier ("the Patient"), went into labor and was admitted to the Hospital. Shortly after the Patient's admission to labor and delivery and per normal protocol, the Hospital's nurses administered Ampicillin to the Patient. The Patient experienced an unforeseen allergic reaction to the Ampicillin. This suit arose out of the events that occurred when the Patient suffered that reaction. The Patient gave birth to Plaintiff a few hours after suffering the reaction to the Ampicillin. Plaintiff was diagnosed with brain injury including developmental delay and cerebral palsy.

In 2012, Plaintiff, through his mother, sued Dr. Roussis and the Hospital for the injuries allegedly sustained during the Patient's reaction to the Ampicillin. Plaintiff alleged, among other things, that Dr. Roussis fell below the standard of care by failing to administer epinephrine when the Patient experienced the reaction to the Ampicillin. Plaintiff also alleged, among other things, that the Hospital nurses fell below the standard of care by failing to monitor and document the Patient's blood pressure readings when the Patient had the reaction to the Ampicillin.

The case proceeded to a ten day trial before a jury. After trial, the Trial Court entered judgment on the jury's verdict on August 4, 2015, that Dr. Roussis was not negligent and that the nurses employed by the Hospital were not negligent and, therefore, dismissed the suit with prejudice. Plaintiff filed a motion for new trial, which the Trial Court denied. Plaintiff appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises nine issues on appeal: 1) whether the Trial Court erred in allowing previously undisclosed testimony from the nurses; 2) whether the Trial Court erred in allowing previously undisclosed testimony from defense expert witnesses; 3) whether the Trial Court erred in restricting testimony from Plaintiff's expert about inconsistencies between the testimony of Dr. Roussis and the medical record; 4) whether the Trial Court erred in allowing allegedly speculative testimony from defense expert witnesses; 5) whether the Trial Court erred in prohibiting Plaintiff from cross-examining defense expert witnesses with literature published after 2009; 6) whether the Trial Court erred in directing a verdict and instructing the jury to disregard testimony about the failure to record blood pressure readings; 7) whether defense counsel made improper statements during closing argument that impacted the

2

verdict; 8) whether the Trial Court erred in refusing to grant a mistrial; and, 9) whether the Trial Court erred in fulfilling its duty as the thirteenth juror.

We begin by considering whether the Trial Court erred in allowing previously undisclosed testimony from the nurses, testimony which was inconsistent with the nurses' earlier deposition testimony. On the fourth day of trial, Plaintiff's counsel called Karen Hensley, R.N. as a witness. Nurse Hensley was one of the nurses employed by the Hospital who was involved in the care of the Patient during labor and delivery. Plaintiff's counsel asked Nurse Hensley if she had any independent recollections of the events that occurred on the day of Plaintiff's birth. Nurse Hensley responded: "A few, yes, sir, I do." Plaintiff's counsel then asked if Nurse Hensley had disclosed those recollections during her deposition. Nurse Hensley responded: "There's been a few things that I've recalled since the deposition, but there's been other evidence that's been presented since then." Nurse Hensley then was asked what she had remembered since her deposition was taken, and she responded: "The pictures that your client's family had taken, there were some things that I saw there and recognized the patient a little more from there."

Out of the presence of the jury, Plaintiff's counsel raised an objection to the new testimony Nurse Hensley was about to present. The Hospital's counsel informed the Trial Court that Nurse Hensley "looked at the pictures that [the Patient's family] made, and it brought up memories about that Dinamap machine." The Trial Court allowed Plaintiff's counsel to conduct a voir dire examination of Nurse Hensley during which Nurse Hensley revealed that she and the other nurses had been shown some photographs during a pre-trial meeting with the Hospital's counsel and that these photographs caused her to recall that "blood pressures were being taken by a Dinamap." Nurse Hensley further testified that she "saw [the blood pressure readings on the Dinamap] while [she] was caring for the patient." Nurse Hensley further stated: "As soon as I saw that she had a Dinamap applied, I knew that blood pressures had been taken, and the patient was not hypotensive, or we would have treated that."

This testimony about a Dinamap machine monitoring the Patient's blood pressure was not disclosed during Nurse Hensley's deposition. During her deposition, Nurse Hensley testified that her only recollection of the events came from the medical chart. The medical chart shows two blood pressure readings documented by a fetal monitor and taken approximately a half an hour apart. The chart also shows a blood pressure reading written in by Dr. Roussis. The blood pressure reading noted by Dr. Roussis apparently was taken between the two readings taken by the fetal monitor. The medical chart contained no readings taken by a Dinamap.

3

During her deposition when Nurse Hensley was asked if she had any way to determine what the Patient's blood pressure was during the time between the two blood pressure readings taken by the fetal monitor, which is when the Patient experienced the reaction to the Ampicillin, Nurse Hensley stated: "The only way to determine that would be if we did a manual blood pressure." Nurse Hensley then stated: "If I had done [a manual blood pressure], I would have documented it." Nurse Hensley could not recall anyone taking any other blood pressure readings. Nurse Hensley was asked several times if she had any recollections of the events at issue, and each time she testified that she had no independent recollection other than what was written in the medical chart.

The Trial Court also allowed Plaintiff's counsel to conduct a voir dire examination of Karen Ott, R.N., another of the Hospital's nurses involved in caring for the Patient. Nurse Ott gave testimony similar to that given by Nurse Hensley about being shown photographs during a pre-trial meeting with the Hospital's counsel that jogged her memory about the events at issue. Similar to the situation with Nurse Hensley, Nurse Ott offered new testimony about a Dinamap machine monitoring the Patient's blood pressure although during her deposition Nurse Ott had stated that she had no recollection about the events other than what was in the medical record. During the voir dire, however, Nurse Ott stated: "we were continuously glancing over at that [Dinamap] monitor to see what her blood pressures were."

After conducting the voir dire examinations of Nurse Hensley and Nurse Ott, Plaintiff's counsel moved for a mistrial. The Trial Court denied the motion. The Trial Court then instructed the attorneys to allow Plaintiff's counsel to re-depose the nurses during the off-hours while the trial continued. The presentation of evidence was altered to allow Plaintiff to do this prior to the nurses testifying before the jury. Plaintiff's expert witnesses, however, already had testified and been released before Plaintiff discovered that the nurses were going to offer testimony new and different from their deposition testimony, and Plaintiff was unable to recall his expert nursing witness.

Plaintiff argues in his brief on appeal that he was severely prejudiced by the new evidence offered by the nurses and that the Hospital had a duty pursuant to Tenn. R. Civ. P. 37.03 to supplement and disclose to Plaintiff the new testimony prior to trial. In pertinent part, Rule 37.03 provides:

> A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. . . .

Tenn. R. Civ. P. 37.03(1). As pertinent, Tenn. R. Civ. P. 26.05 provides:

4

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information therafter acquired, except as follows:

* * *

(2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which the party (A) knows that the response was incorrect when made; or (B) knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Tenn. R. Civ. P. 26.05(2).

The Hospital argues in its brief on appeal that it had no duty to supplement and disclose to Plaintiff that after being shown by the Hospital's attorney the photographs of the Patient the Hospital's nurses remembered information that changed their testimony. The Hospital bases this argument, in part, upon the fact that the nurses employed by the Hospital were not parties to this suit. Although conceding that it would have had a duty to disclose newly discovered testimony of the Hospital's corporate representatives, the Hospital asserts that it had no duty to supplement with regard to these non-party employee nurse witnesses. This argument is disengenous.

Our Supreme Court has discussed the definition of the word 'party' stating:

The word "party" is not a term of art uniformly defined at common law or by statute; rather, its meaning depends upon the context in which it appears. *See, e.g.*, Tenn. Code Ann. § 39–11–401(a) (2010) ("A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both."); *State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007) (holding that a rape victim was not a "party" for purposes of the hearsay exception for party admissions); *Monceret v. Bd. of Prof'l Responsibility*, 29 S.W.3d 455, 460 (Tenn. 2000) (holding that the professional obligation of an attorney to obtain consent before communicating with a represented "party" extends to a witness represented by counsel); *Boles v. Smith*, 37 Tenn. (5 Sneed) 105, 106 (1857) (holding that a landlord was not a "party" to an action of ejectment where the trial court improperly allowed him to conduct his tenant's defense).

5

These examples demonstrate, moreover, that general definitions of "party," while helpful, cannot be dispositive. *Compare Boles*, 37 Tenn. at 107 ("By the term *party*, in general, is meant one having a right to control the proceedings, to make a defence, to adduce and cross-examine witnesses, and to appeal from the judgment."), *with* Black's Law Dictionary 1154 (8th ed. 2004) (defining "party" as "one by or against whom a lawsuit is brought.").

*Mann v. Alpha Tau Omega Fraternity*, 380 S.W.3d 42, 49 (Tenn. 2012).

In another case, one involving a disciplinary action against an attorney who had deposed a witness without obtaining the consent of the witness's attorney, our Supreme Court discussed the meaning of the word 'party' as used in a disciplinary rule stating:

The initial question in this case deals with the meaning and scope of "party" as used in the Rule. According to *Black's Law Dictionary* 1122 (6th ed.1990), "party" includes any "person concerned or having or taking part in any affair, matter, transaction, or proceeding, considered individually." *Id*. Another source, however, contains multiple definitions of "party," including: "a person who participates or is concerned in an action, proceeding, plan, etc.," and "either of the persons or sides concerned in a legal matter." *Webster's New World Dictionary* 1037 (2d ed.1980). Accordingly, to the extent that the term is reasonably susceptible to more than one meaning, it is ambiguous.

In a formal opinion released on July 28, 1995, the American Bar Association agreed that the word "party" as used in the rule is ambiguous and stated that "[t]he key to resolving this ambiguity . . . is consideration of the purposes intended to be served by the Rule." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 95–396 (1995). The ABA observed that interests of "protecting the client-lawyer relationship from interference by [adverse] counsel, and protecting clients from disclosing privileged information that might harm their interests, are not limited to circumstances where the represented person is a party to an adjudicative or other formal proceeding." *Id*.

\* \* \*

6

Similarly, a large majority of courts in a variety of circumstances, both civil and criminal, have held that a "party" is not limited to a named plaintiff or defendant. As one court has said:

> [W]e have no trouble concluding that the definition of "parties" under the rule is not restricted to named parties in a lawsuit. The language of the rule suggests no limitation on the word "party." Instead, the rule prohibits communication "on the subject on the representation" with a party that is represented by a lawyer "in that matter." The use of the words "subject" and "matter," rather than "lawsuit," indicates that DR 7–104 applies to all transactions for which lawyers are hired and cannot be construed to imply that its application is limited to cases where suit is filed.

*In re Illuzzi*, 159 Vt. 155, 616 A.2d 233, 236 (1992); *see also Hill v. St. Louis Univ.*, 123 F.3d 1114 (8th Cir. 1997) (rule applies to professor/employee where university is the named defendant); *Wright by Wright*, 103 Wash.2d 192, 691 P.2d 564 (1984) (rule applies to managing employees who worked for a corporation that was the named defendant); Sarno, 26 A.L.R.4th at 108–11.

> Accordingly, we conclude that the term "party" as used in DR 7–104(A)(1) is not limited to the named plaintiff or defendant in a pending lawsuit. The language used in the rule does not limit its applicability to named plaintiffs or defendants in a filed lawsuit.

*Monceret v. Bd. of Prof'l Responsibility*, 29 S.W.3d 455, 459-60 (Tenn. 2000).

The fact that the nurses were not individually named as defendants in this suit is not dispositive of the issue of whether the Hospital had a duty to supplement with regard to its employee nurses's testimony. There is no dispute that the Hospital is a party to this suit. There is no question that the Hospital, as a party, had a duty to supplement its prior responses. The Hospital was sued due to the alleged actions or inactions of its employee nurses.

The Hospital asserts that it would have a duty to supplement pursuant to Rule 26.05 only with regard to testimony of its corporate representatives. The Hospital's position is understandable as "corporate representatives" of a hospital rarely are involved in the actual care and treatment of patients. If the Hospital is found liable in this case, it will be because of the actions or inactions of its employee nurses, not those of its

7

corporate representatives. Furthermore, we note that the nurses were shown the photographs at issue during a meeting with the Hospital's attorney in preparation for trial. Construing Rule 26.05 to mean that a corporate entity would be required to supplement only with regard to its corporate representatives and not its employees actually involved would give an unjust advantage to corporations over individuals. Such a construction would be contrary to the Tennessee Rules of Civil Procedure which specifically state: "These rules shall be construed to secure the just, speedy, and inexpensive determination of every action." Tenn. R. Civ. P. 1. There would be nothing "just" about allowing a corporation, such as the Hospital, to know that the testimony of its employees whose conduct the corporation may be liable for has totally changed from their deposition testimony and not requiring the corporation to supplement its employees' responses. Such a construction not only would permit corporations to engage in court sanctioned trial by ambush, but would encourage it. To adopt the Hospital's construction would mean that the Tennessee Supreme Court in adopting Tenn. R. Civ. P. 26.05(2) and 37.03 intended to give corporations an unjust advantage over individuals. Instead of adopting such a construction, we will comply with the explicit direction of Tenn. R. Civ. P. 1 and construe the rule "to secure the just . . . determination of every action." Tenn. R. Civ. P. 1.

As this Court stated in *Hall v. Crenshaw*:

Tennessee has long recognized that a corporation can function only through its agents and employees, that the acts of an employee may be attributed to the employer, and that the corporation's knowledge is acquired via its agents and employees. "A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corporation's agents are attributed to the corporation itself." *Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). Any knowledge that Drs. Cherry and Mariencheck may have regarding the decedent's treatment was acquired in the course and scope of their employment and is already imputed to the Jackson Clinic. *See Bland v. Allstate Ins. Co.*, 944 S.W.2d 372, 376 (Tenn. Ct. App. 1996) ("Of course, the knowledge of an agent is imputed to his principal.") (citing *Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982); *Amer. General Life Ins. Co. v. Gilbert*, 595 S.W.2d 83, 87 (Tenn. Ct. App. 1979)).

*Hall v. Crenshaw*, 449 S.W.3d 463, 472 (Tenn. Ct. App. 2014) (holding that defense counsel representing a defendant corporate medical entity may communicate *ex parte* with non-party physicians employed by the defendant corporate medical entity who treated a plaintiff's decedent.)

8

Although the nurses were not named individually as defendants, the Hospital had a duty to supplement pursuant to Rule 26.05 when it learned that its employee nurses had not only new but different testimony to offer. The nurses were not some third party witnesses with no connection to the Hospital. Instead, the nurses are the Hospital's employees whose conduct is attributed to and gives rise to the Hospital's liability, if any, in this health care liability action.

The Hospital also asserts that the allegedly new testimony given by the nurses actually was not new because the Hospital had asserted from the beginning that the Patient's blood pressures were monitored. This argument is disengenuous. Although the Hospital's theory of the case may have been that the Patient's blood pressure readings were monitored, the nurses during their depositions stated that they could recall nothing about the monitoring of the Patient's blood pressure beyond what was stated in the medical chart. The medical chart was devoid of any mention of the Patient's blood pressure readings being monitored by a Dinamap machine. Nothing within the medical chart suggests that a Dinamap was utilized while the Patient was having the reaction to the Ampicillin. As such, the new testimony offered by the nurses that they recalled using a Dinamap and viewing the Patient's blood pressure readings on the Dinamap during the relevant time period was indeed new, different, and previously undisclosed testimony.

The Hospital also asserts that Plaintiff provided the photographs and that Plaintiff's counsel could have shown the photographs to the nurses during their depositions. This could have/should have/would have assertion is meaningless misdirection. While it is true that Plaintiff's counsel could have shown the nurses the photographs, this assertion is immaterial to an analysis of this issue. The Hospital's counsel did show the nurses the photographs after their depositions were taken and knew that seeing the photographs jogged the nurses's memories causing the nurses to change their testimony. Once the Hospital had that information, it was under a duty to supplement, no matter what Plaintiff could have done previously.

The Hospital failed to supplement pursuant to Tenn. R. Civ. P. 26.05. As such, pursuant to Tenn. R. Civ. P. 37.03, the previously undisclosed and contradictory testimony of the nurses should have been excluded. We hold that it was error to allow the previously undisclosed testimony of the nurses, and such error cannot be considered harmless in this case because it was relevant to a central issue of whether the Patient's blood pressure was monitored or not. As such, we vacate the Trial Court's judgment and remand this case for a new trial.

Although our holding with regard to Plaintiff's first issue is dispositive on its own, we will consider several of Plaintiff's remaining issues. We next consider whether the

Trial Court erred in allowing previously undisclosed testimony from defense expert witness Arnold Grandis, M.D.[1]  At trial, Arnold Grandis, M.D. was called as an expert witness for Dr. Roussis.  During a Tenn. R. Evid. Rule 104 hearing out of the presence of the jury, Plaintiff's counsel asked Dr. Grandis if there was any evidence to support Dr. Grandis's opinion that Plaintiff suffered an injury in utero prior to birth, and Dr. Grandis offered an opinion about meconium staining.  The following exchange then occurred:

> Q. Dr. Grandis, at no time during your deposition did you mention this meconium as being a basis of your opinion, did you?
> A. I do not recall whether I did, but in trying to be the best witness I can, I have spent many hours since our deposition reviewing the medical records, and perhaps I found something in the records since our deposition, sir.
> Q. Well, do you remember me asking you, sir, that if you come up with anything new to notify [Dr. Roussis's counsel] so he could notify me so I wouldn't be ambushed here at trial?
> A. Again, sir, I wasn't trying to ambush you.  I was trying to answer the questions to the best of my ability, sir.

Plaintiff argues in his brief on appeal that the Trial Court erred in allowing the admission of Dr. Grandis's previously undisclosed testimony about meconium staining.

> In *Stanfield v. Neblett* this Court explained:
>
> Pursuant to Rule 37.03 of the Tennessee Rules of Civil Procedure, the trial court may exclude an expert's testimony when the opposing party asserts that the expert did not disclose an opinion in his or her Rule 26 expert disclosures.  "Exclusion is proper only if the disclosures failed to give the opposing side reasonable notice of the opinions such that, without exclusion, there would be unfair surprise or trial by ambush." *Watkins v. Affiliated Internists, P.C.*, No. M2008–01205–COA–R3–CV, 2009 WL 5173716, *20 (Tenn. Ct. App. Dec. 29, 2009) (citations omitted).  The decision to exclude an expert's testimony under Rule 37.03 rests within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. *Id*.

*Stanfield v. Neblett*, 339 S.W.3d 22, 30 (Tenn. Ct. App. 2010).  As pertinent to the issue now before us, Tenn. R. Civ. P. Rule 26.05 provides:

---

[1] In his brief on appeal, Plaintiff also asserts that the Trial Court erred in allowing previously undisclosed testimony about meconium staining from defense expert witness Joseph Philips, III, M.D.  Given the record now before us, it is not as clear as the situation with Dr. Grandis whether the testimony given by Dr. Philips about meconium staining was undisclosed previously or not.

(1) A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters; and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of that testimony.

Tenn. R. Civ. P. 26.05(1).

Pursuant to Tenn. R. Civ. P. 26.05, Dr. Roussis had a duty to supplement his expert's previously undisclosed testimony. It appears from the record now before us, however, that Dr. Grandis may well not have made Dr. Roussis's counsel aware that Dr. Grandis had formed new opinions and intended to testify about meconium staining. As such, if Dr. Roussis's counsel was unaware that Dr. Grandis planned to offer new opinions, we cannot fault Dr. Roussis for failing to supplement with regard to these opinions. Despite this, the Trial Court erred in allowing the admission of Dr. Grandis's previously undisclosed testimony about meconium staining, and such error cannot be considered harmless in this case as it was relevant to the issue of causation.

We next consider whether the Trial Court erred in restricting testimony from Plaintiff's expert about inconsistencies between the testimony of Dr. Roussis and the medical record. In his brief on appeal, Plaintiff asserts that the Trial Court "granted the Defendants' Motion in Limine to prohibit Dr. Bryant from commenting on the inconsistencies between the medical records and the testimony of Dr. Roussis." Given the record now before us, however, we are unable to determine exactly what inconsistencies Dr. Bryant was prevented from testifying about. As such, we are unable to determine one way or the other about whether the Trial Court erred with regard to this issue, and we make no assertion either way. Plaintiff, as the appellant in this case, had the duty "to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." *Boggs v. Rhea*, 459 S.W.3d 539, 546 (Tenn. Ct. App. 2014) (quoting *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997)).

Next, we consider whether the Trial Court erred in allowing allegedly speculative testimony from defense expert witnesses. As our Supreme Court has explained:

Any challenge to the admissibility of testimony from a medical expert who is competent to testify under section 29–26–115(b) can be made based on the Tennessee Rules of Evidence. In particular, Tennessee Rules of Evidence 702 and 703 are called into play. Rule 702 provides that "[i]f

scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," and Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

In describing the function of Rules 702 and 703, we have stated

> that the preliminary question under Tenn. R. Evid. 104 is one of admissibility of the evidence. Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof. After that occurs, a defendant may, of course, challenge the sufficiency of the evidence by moving for a directed verdict at the appropriate times. *See* Tenn. R. Civ. P. 50. Yet it is important to emphasize that the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact.

*McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997) (citation omitted). A trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703.

12

In its role as a gatekeeper, the trial court is to determine (1) whether the witness meets the competency requirements of Tennessee Code Annotated section 29–16–115(b) and, (2) whether the witness' testimony meets the admissibility requirements of Rules 702 and 703. The trial court is not to decide how much weight is to be given to the witness' testimony. Once the minimum requirements are met, any questions the trial court may have about the *extent* of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility. *See Stovall*, 113 S.W.3d at 725 (noting that arguments concerning a medical expert's qualifications and competency to testify "take issue primarily with [the expert's] qualifications and the *weight* that should be given his opinions . . . . [t]hese are issues for trial and not for summary judgment") (emphasis in original); *Coyle*, 822 S.W.2d at 600 ("The objection raised by the defendant [regarding the expert's qualifications and competency] goes more to the weight of the evidence rather than to its admissibility").

*Shipley v. Williams*, 350 S.W.3d 527, 550-51 (Tenn. 2011). With regard to the admission of expert testimony, our Supreme Court has further explained:

Generally, questions pertaining to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion. *McDaniel* [*v. CSX Transportation, Inc.*, 955 S.W.2d 257], 263 [Tenn. 1997]. We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion. *Id*. at 263–64. A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

\* \* \*

The trial court, therefore, must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy. In addition to these specific rules, evidence generally must be relevant to be admissible. *See* Tenn. R. Evid. 401, 402. . . .

In *McDaniel*, we listed several nonexclusive factors that courts could consider in determining the reliability of scientific testimony, including

13

(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) (applying the first four factors in determining the reliability of scientific expert testimony pursuant to the Federal Rules of Evidence); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (considering on remand the fifth factor in addition to the first four factors).

\* \* \*

We continue to emphasize, however, that these factors are non-exclusive and that a trial court need not consider all of these factors in making a reliability determination. Rather, the trial court enjoys the same latitude in determining how to test the reliability of an expert as the trial court possesses in deciding whether the expert's relevant testimony is reliable. *Kumho Tire Co.*, 526 U.S. at 152, 119 S. Ct. 1167. The objective of the trial court's gatekeeping function is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Furthermore, upon admission, expert testimony will be subject to vigorous cross-examination and countervailing proof. *Stevens*, 78 S.W.3d at 835; *McDaniel*, 955 S.W.2d at 265. The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact. *See McDaniel*, 955 S.W.2d at 265.

\* \* \*

Although a trial court has great latitude in assessing the reliability of expert testimony, we have never required a rigid application of the *McDaniel* factors in a reliability determination involving scientific or nonscientific expert evidence. *See Stevens*, 78 S.W.3d at 834; *McDaniel*, 955 S.W.2d at 265. Rather, we have characterized the factors as a "non-exclusive list"

14

that a trial court "may" consider in determining reliability. *McDaniel*, 955 S.W.2d at 265.

* * *

An expert may reach a conclusion from observations based upon his or her extensive and specialized experience. *Kumho Tire Co.*, 526 U.S. at 156, 119 S. Ct. 1167. Opinions derived in this manner, however, "do not easily lend themselves to scholarly review or to traditional scientific evaluation." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001).

*Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273-77 (Tenn. 2005).

Plaintiff raises several arguments in his brief on appeal with regard to this issue. First, Plaintiff states that defense expert Robert J. Baumann, M.D. expressed opinions that the damage occurred prior to labor and alleges that Dr. Baumann "has never taken the time to see what the literature has to say or find out if others agree with him." Plaintiff further states that Dr. Baumann "disagrees with the leading authoritative text in his field and does not know if any of his opinions are generally accepted by others in his field."

A careful and thorough review of the record on appeal reveals that Dr. Baumann based his opinions, in large part, upon his own experiences. During a Tenn. R. Evid. Rule 104 hearing out of the presence of the jury, Dr. Baumann stated that his opinions were based, in part, upon his experience treating "a large number of these children" and also stated that his own "observation is different from [the observation of the author of the allegedly leading authoritative text]." Dr. Baumann also pointed out that the author of the textbook stated that his assertions were based upon the author's own experience just as Dr. Baumann's assertions were based upon his own experience.

Dr. Baumann testified before the jury about his qualifications as a child neurologist. When Dr. Baumann was asked about the types of children he treats, he testified:

So we see children who have neurologic disease, children with epilepsy, children with cerebral palsy. We see children where people are worried they have neurologic disease. We run an active service in the Children's Hospital and at the University of Kentucky. The state of Kentucky is divided in half, so we have the advanced neonatal intentive care unit for the eastern half of the state. Louisville has the advanced

15

neonatal intensive care unit for the western half of the state. So if any nurseries have babies that are sick, you know, they'd fly them in to our nursery. And, of course, we deliver a bunch of moms who are at risk for having sick babies. So when we're on service, we routinely round in the nursery to see sick babies.

And then when the babies leave the nursery, unfortunately, they aren't all well. Some of them have persisting neurologic problems, epilepsy, cerebral palsy, developmental delay, learning disabilities, and so we follow up and see these youngsters in clinic. The kids who live, you know, around Lexington we see in the clinic at the university. The kids who are out from the rural counties, then we follow and see them in our outreach clinics.

Dr. Baumann further testified that he treats children who have experienced hypoxic-ischemic brain injury and stated that "those children are preferentially sent in from the outside hospitals into our nursery." Dr. Bauman testified that he is consulted by other doctors including neonatologists, pediatricians, family practitioners, child psychiatrists, and the "children's orthopedists who run the Shriners Hospital. . . ."

The fact that Dr. Baumann allegedly "has never taken the time to see what the literature has to say or find out if others agree with him . . .," and the fact that Dr. Baumann allegedly disagrees with a text in his field go more to the weight to be assigned to Dr. Baumann's testimony, a determination properly left to the trier of fact. Plaintiff failed to show that Dr. Baumann's testimony would not substantially assist the trier of fact or that the facts or data upon which Dr. Baumann relied were not trustworthy. We find no error in the Trial Court's admission of Dr. Baumann's testimony.

Plaintiff also asserts that the testimony of defense expert Joseph Philips, III, M.D. should have been excluded because Dr. Philips testified that his opinion took into account monkey studies that had been done with regard to cord occlusion. Plaintiff argues that this testimony was unreliable and speculative. Plaintiff bases this argument, in part, upon the fact that another defense witness, Dr. Grandis, testified that the monkey studies were irrelevant.

Plaintiff's argument goes more to the weight to be assigned to Dr. Phillips's testimony than to its reliablity. The fact that another defense expert testified that the monkey studies were irrelevant to this case does not render Dr. Philips's opinions unreliable or speculative. The decision about the weight to be given to Dr. Philips's testimony rests with the trier of fact. Plaintiff failed to show that Dr. Philips's testimony would not substantially assist the trier of fact or that the facts or data upon which Dr.

16

Philips relied were not trustworthy. We find no error in the Trial Court's admission of Dr. Philips's testimony.

Next, we consider whether the Trial Court erred in prohibiting Plaintiff from cross-examining defense expert witnesses with literature published after 2009. Defendants filed a joint motion in limine seeking to exclude: "Any references to medical literature after June 19, 2009 that describe the care that may or should be rendered to a patient at a later time . . ., as well as any testimony by any plaintiff's expert who seeks to bolster his or her standard of care testimony by referring to literature published after June 19, 2009." Plaintiff filed a response that stated, in pertinent part: "Plaintiff has no opposition to the following Motions in Limine as long as they are applied the same to both parties: . . . . Defendants' Joint Motion in Limine to Exclude Evidence of the Standard of Care or Medical Literature References to the Standard of Care After June 19, 2009." When arguing the motions in limine before the Trial Court, defense counsel represented that the parties "have an agreement and will not argue the motion in limine to exclude evidence of standard of care or medical literature after June 19, 2009." Plaintiff raised no objection to this statement made by defense counsel. The Trial Court granted the motion in limine.

At trial, Plaintiff attempted to cross-examine a defense expert witness using an article published in 2012. Defense counsel objected and Plaintiff argued that "we agreed not to try and introduce anything after 2009 in our case in chief, but we never agreed not to use it to cross-examine their experts." Plaintiff also argued:

> Your Honor, the reason I was getting into that is Dr. Levin has been up here, and he's been testifying about all the literature and all of these case studies and all of this and all of the literature he's done as if there is no literature out there on anaphylaxis in pregnancy, and there's plenty of it out there. He's considered this doctor to be one of the world's authorities on it, and I - -
>
> My question was going to be that there's been no change - - and there hasn't been any change - - in how to treat anaphylaxis in a pregnant woman whether it's 2012 or 2005. I'm not trying to say the standard of care in 2012 based on that. But if he agrees the standard of care was the same in 2008, then that would apply.

The Trial Court granted the defendants' objection to Plaintiff's question stating: "Based on the Court's reading of the Defendants' motion and the Plaintiff's response to the Defendants' joint motion in limine, the Court is of the opinion that this article would be

improper, and the Court is going to grant the objection." The Trial Court then gave the jury a curative instruction stating:

> The witness was asked about an article that was after this incident happened, and the Court has already ruled that any medical articles dealing with care after the date of this birth are not relevant and should not be considered. As a result, you will disregard any questions with regard to that article.

In his brief on appeal, with regard to this issue, Plaintiff states:

> The articles were relevant to both standard of care and causation. Defendant did not submit a single shred of evidence that the standard of care changed from 2009 to 2012 or that the article contained information that was not available in 2009. To the contrary, the articles at issue reference numerous other articles and studies, most of which were published in or before 2009.

In his brief on appeal, Dr. Roussis[2] asserts that the motion in limine was based upon the fact that pursuant to Tenn. Code Ann. § 29-26-115 a claimant has the burden of proving, among other things, the "recognized standard of acceptable professional practice in the profession . . . at the time the alleged injury or wrongful action occurred; . . . ." Tenn. Code Ann. § 29-26-115(a)(1) (2012). Dr. Roussis argues: " A medical journal article published in 2012 clearly has no bearing on the applicable standard of care in 2009, and would constitute cross-examination on topics **unrelated** to the standard of care applicable as of June 19, 2009." (emphasis in original).

Unfortunately, given the record now before us, we are unable to determine the substance of the 2012 article about which the parties argue. As such, we are unable to make any determination about whether it would have been error to grant the motion in limine on the basis that the article was post-event and thus not relevant. That, however, is not what the Trial Court did. The Trial Court granted the motion in limine based upon the parties' representation of agreement and its own understanding of the purported agreement between the parties with regard to the motion in limine. Based upon the record, we see no error in the Trial Court's granting the objection made at trial and issuing a curative instruction. Upon remand, we suggest that the parties clarify for the Trial Court any agreement or disagreement with regard to this issue.

---

[2] In its brief on appeal, the Hospital "adopt[ed] and incorporate[d] by reference the arguments of co-Defendant, Dr. Roussis" with regard to this issue.

We next consider whether the Trial Court erred in directing a verdict and instructed the jury to disregard testimony about the failure to record blood pressure readings. As this Court has stated:

> A trial court's decision to grant a motion for directed verdict involves a question of law. *Underwood v. HCA Health Servs. of Tennessee, Inc.*, 892 S.W.2d 423, 425 (Tenn. Ct. App. 1994). On appeal, we apply the same standard used by the trial court when ruling on the motion initially. *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 754 (Tenn. Ct. App. 1997). Accordingly, we do not weigh the evidence or evaluate the credibility of witnesses. *Id*. (citing *Underwood*, 892 S.W.2d at 425). Rather, we consider all of the evidence, taking the strongest legitimate view of it in the non-moving party's favor. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). The court should grant the motion, "only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id*.

*Stanfield*, 339 S.W.3d at 29.

Upon motion of the Hospital, the Trial Court granted a directed verdict holding that the failure to document the blood pressure readings did not cause Plaintiff's injury. The Trial Court then instructed the jury: "you cannot consider that the failure to document blood pressures was a cause of the injury. You may consider the blood pressures, but you cannot consider that not charting those or putting those in the chart caused the injury itself."

Taking the strongest legitimate view in Plaintiff's favor, as we must, we find that directing a verdict on this issue likely could have confused the jury. While "the failure to document blood pressures was [not] a cause of the injury," evidence regarding the lack of blood pressure readings in the medical record was relevant evidence as to whether the Patient's blood pressure readings were being taken and appropriately monitored. Thus, reasonable minds could disagree about the conclusions to be drawn with regard to the evidence concerning the failure to record the blood pressures. As such, the Trial Court should not have directed a verdict with regard to this issue.

Next, we consider whether defense counsel made improper statements during closing argument that impacted the verdict. As this Court has stated:

> "Closing argument is a crucial component of any jury trial." *McCrory v. Tribble*, No. W2009-00792-COA-R3-CV, 2010 WL 1610587,

19

*6 (Tenn. Ct. App. April 22, 2010). Closing arguments allow counsel to present their theory of the case and to point out strengths and weaknesses in the evidence. "[C]ounsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments." *Anderson v. State*, No. E2008-00439-CCA-R3-PC, 2009 WL 2474673, *6 (Tenn. Crim. App. Aug. 13, 2009). As with all other arguments by counsel, this Court reviews the trial court's decisions on closing arguments under an abuse of discretion standard. *Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991).

*Stanfield,* 339 S.W.3d at 43.

During closing argument the Hospital's counsel made the following statements:

It's been a contentious case. The judge, Judge Ailor, has had to rule on a lot of things. He's done an excellent job. Sometimes in voir dire, I pull out a book and I warn you in advance, and I didn't do it in this trial. I overlooked it, I guess, because I didn't know how contentious it was going to be. This book I'm holding up says, "Tennessee Rules of Court." We are trained in it as lawyers. Now, I'm not telling you it's all black and white, but a whole lot of it is, and we've had to object and object and object and object. I didn't keep score or count, but there were - - 90 percent of our objections were sustained.

Plaintiff's counsel objected, and the Trial Court overruled the objection. The Hospital's counsel then stated: "See, we can't even agree on that. You 14 people heard it. Don't take my word for it."

These statements made by the Hospital's counsel had nothing whatsoever to do with the evidence that was presented at trial. Nor did they have anything to do with the Hospital's theory of the case or the ultimate issues that the jury was about to decide. Rather, these statements served no possible purpose other than to attempt to denigrate opposing counsel, and, therefore, the Plaintiff's case in the eyes of the jury. As Plaintiff stated in his brief on appeal, these statements suggested to the jury that "Plaintiff's counsel was somehow trying to circumvent the rules." Taken alone these statements might not rise to the level of being reversible error. When considered along with the other errors as discussed above, however, these statements served no purpose other than to prejudice the jury and suggest that Plaintiff's counsel was not following the rules even though he knew better. We caution all counsel to refrain from making improper arguments of this nature.

20

Our resolution of the foregoing issues renders Plaintiff's remaining issues moot. We vacate the Trial Court's August 4, 2015 judgment and remand this case for a new trial.

## **<u>Conclusion</u>**

The judgment of the Trial Court is vacated, and this cause is remanded to the Trial Court for further proceedings in compliance with this Opinion and for collection of the costs below. The costs on appeal are assessed one-half against the appellee, Periclis Roussis, M.D.; and one-half against the appellee, Fort Sanders Perinatal Center and Fort Sanders Regional Medical Center.

_____
D. MICHAEL SWINEY, CHIEF JUDGE